UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YOK
_____X

LISA TILLEY, individually                                    INDEX NO.

              Plaintiff                          <u>COMPLAINT</u>

    -against-                                    JURY TRIAL DEMANDED


Christopher Shelton as President of Communications
Workers of America Local 1101 as successor / f/k/a
Local 1105 Verizon Communications, Inc. and
Veronica Peters, individually,

           Defendants.
_____X

      Plaintiff Lisa Tilley by and through her attorney Susan Ghim, Esq. allege against all named Defendants as follows:

<u>PRELIMINARY STATEMENT</u>

1.      Lisa Tilley ("Plaintiff") commenced her employment with Verizon Communications, Inc. ("Defendant Verizon") as a call center customer service representative at Defendant Verizon's Queens, NY location from on or about 1999.  Plaintiff worked at Defendant Verizon's Brooklyn, NY location from on or about 2009 and was terminated on or about April 1, 2015.  At the time of her termination, Plaintiff had sixteen (16) years of labor invested in Defendant Verizon and had four (4) years away from full retirement benefit payouts from pension. The Defendant union refused to arbitrate the termination pursuant to their grievance and arbitration procedure under the collective bargaining agreement (CBA) with employer Verizon, despite having a meritorious grievance.  The Defendant had a duty of fair representation to arbitrate meritorious grievances and in bad faith, breached that duty to Plaintiff under 29 USC §185

1

2.      On or about April 15, 2015, Plaintiff filed a discrimination and retaliatory termination

complaint against Plaintiff's supervisor Defendant Peters who discharged Plaintiff on April 1,

2015.  On or about May 2015, the Defendant Verizon's EEO office (Verizon EEO) by and

through Kathy Aiello contacted Plaintiff by phone to advise that Ms. Aiello herself performed an

investigation of Plaintiff's complaint and interviewed witnesses and Verizon EEO determined

that Plaintiff's complaint was: a) "founded" on the discrimination and retaliatory discharge

claims.  Ms. Aiello commented there was "no way you could have functioned in that type of

environment with Veronica Peters retaliating against you;" and  b) the Plaintiff was

recommended for reinstatement to employment; and c) Defendant Peters was to be transferred to

Defendant Verizon's office in Long Island so that Plaintiff could safely return to the Brooklyn

office; and d) Plaintiff was instructed to call the union because Verizon EEO sent this

information to them.  Verizon EEO did not provide the information to Plaintiff in writing.  Kathy

Aiello insisted that Plaintiff contact the union because they had the reinstatement information.

This was corroborated by a text message shortly thereafter to Plaintiff from a union steward who

stated she was happy to hear Plaintiff was returning.

3.      However, when Plaintiff contacted the union, the union told Plaintiff they had not

received any such information about a recommendation for re-instatement by Verizon EEO.

Plaintiff promptly called Kathy Aiello / Verizon EEO and it was repeated to Plaintiff that the

complaint was founded, Plaintiff was recommended for reinstatement and that the union

emphatically had the information and to call them about this recommendation.   Plaintiff

promptly contacted the union again reiterating Verizon EEO's instructions.  Again, the union

denied knowledge of any such recommendation and that it did not receive any information from

Verizon EEO.  Plaintiff contacted Kathy Aiello again and the same findings and instructions to

call the union were repeated Plaintiff.  This third time Ms. Aiello sounded exasperated and

impatient stating I don't know why they are saying that, we sent them the information about your

reinstatement and to call the union.  Thereafter, the union repeatedly denied receiving any

information about a recommendation to reinstate Plaintiff.

4.      Plaintiff contacted the Defendant union a minimum of every six months or less every

year since 2015 and each time Defendant union denied receipt of any recommendation to

reinstate Plaintiff.  By denying the existence of the Verizon EEO recommendation, the

Defendant union fraudulently concealed their breach of the duty of fair representation (DFR)

pursuant to 29 USC §185 et seq. and federal common law under *Vaca v. Sipes,* 386 US 171

(1967) and its progeny of case law,  in 2015 when they told Plaintiff her termination grievance

and arbitration lacked merit.  The union could not acknowledge that it received the Verizon EEO

recommendation to reinstate plaintiff without also admitting it breached DFR.   The

recommendation rendered Plaintiff's termination grievance meritorious which was in direct

contravention of their decision that it was non- meritorious and therefore refused to arbitrate the

termination in 2015.

5.      On or about July 2020, Plaintiff by chance ran into an employee who worked at the same

Verizon Brooklyn office as Plaintiff during the relevant time period.  This employee asked why

Plaintiff never returned to work after her termination because she stated to Plaintiff, "You were

supposed to come back."   This information was still conjecture at this time but Plaintiff

promptly started seeking information about remedies she could undertake regarding the Verizon

EEO recommendation.

6.      Thereafter, on or about November 11, 2020, a union steward, Marlene Lee who worked

at the same Verizon Brooklyn office as Plaintiff sent a facebook message condolence to Plaintiff

as Plaintiff's ex-husband's funeral took place on or about November 11, 2020.  Plaintiff and Ms. Lee did were acquainted and did not regularly discuss workplace or union matters with each other during the relevant time. Plaintiff and Ms. Lee only knew of each other because Ms. Lee was a union steward at Plaintiff's workplace and attended the same church and Plaintiff's recently deceased ex-husband.  By chance again, a line of communication opened up between Plaintiff and Ms. Lee.  They freely discussed Plaintiff's termination in 2015 because Ms. Lee was able to speak more freely about Plaintiff's termination as Ms. Lee recently transferred from the Brooklyn office and was no longer working under the auspices of Defendant Peters and the Defendant union.

7.      Ms. Lee informed Plaintiff that Defendant Peters had a list of people that she terminated for taking FMLA leave.  Ms. Lee named the people on that list in 2015 and stated Plaintiff's name was on that list.  Ms. Lee also stated that Defendant Peters gloated that she successfully had Plaintiff "fired."  All but one person named off of Defendant Peters' "list" were women of African heritage.  During a further discussion with Defendant Peters, Ms. Lee complained to Defendant Peters that if Plaintiff were white, she would not have been fired, to which Defendant Peters said, "Yes, I love white people."  Ms. Lee commented to Plaintiff that the replacement employees of those terminated were mostly, if not all white employees.

8.      Plaintiff contacted Kendall Moultrie on or about December 14, 2020 and informed Ms. Moultrie that she was on a list of people with Plaintiff who were terminated in 2015 for taking FMLA sick time off.  Ms. Moultrie stated that she recalled an incident back in 2015 where another co-worker stated to her that she "just saw" paper work that Defendant Peters set down on a desk face up.  This co-worker stated it was a list of people's names with notes about FMLA and indicated adverse employment action next to their names.

9.      The Defendants collectively engaged in a racist and discriminatory scheme to terminate African American female employees who were vested in their pensions under the pretext that they improperly took FMLA paid sick time.  Defendant Peters' regular racist comments to black female employees and stereotypes of Plaintiff that she had a "baby daddy" and that Plaintiff "did not raise her child" and constant re-iterations to Plaintiff, Marlene Lee and Kendall Moultrie and other employees that "black people are lazy" guided her employee termination targets.  Having less vested pension employees saved significant sums of money for Defendant Verizon. Defendant union suffered no loss as long as these employees were replaced by new union dues paying employees and Defendant Verizon continued to pay hours into the union pension and welfare funds.  And the Defendant union saved costs on each arbitration it did not have to undertake.

10.     Based on these facts, Defendant Verizon negligently hired and retained Defendant Peters. Defendant Peters tortiously interfered with the employee-employer relationship between Defendant Verizon and Plaintiff by fabricating improper FMLA paid time off by African American employees.  Defendant union and Defendant Peters in concert inflicted severe emotional distress on Plaintiff due to the Defendant union's malicious, willful and fraudulent concealment of their breach of DFR.   As a result, Defendants collectively engaged in a civil conspiracy under New York State law.

11.     Accordingly, Plaintiff seeks damages from the Defendant CWA Local 1101 and Defendant Verizon, jointly and severally for back pay, reinstatement to employment, reinstatement to the union pension funds with retroactive credits for work hours, damages for the pension amounts Plaintiff would have received if she were not terminated, reinstatement of seniority under the CBA, additionally, actual, compensatory, and punitive damages, pre and post

judgment interest, statutory and common law attorneys fees and costs; Plaintiff also seeks actual, compensatory, punitive and all other state law tort damages against Defendant Verizon for negligent hiring and retention of Defendant Peters and damages from Defendant Peters for and tortious interference with the employer – employee relationship between Plaintiff and Defendant Verizon; and punitive damages from all named Defendants for infliction of emotional distress on Plaintiff and treble and punitive damages under New York common law action for civil conspiracy and attorneys fees and costs;  and any and other further relief that this Court deems just and proper.

<u>JURISDICTION and VENUE</u>

12.     Pursuant to 28 USC §1331 this Court has original jurisdiction of claims pursuant to 29 USC §159 and §185 et seq.  and causes of action for a union's breach of the duty of fair representation ("DFR") pursuant to federal common law under *Vaca v. Sipes* 386 US 171 (1967) and its progeny of case law.

13.     Pursuant to 28 USC §1367(a) his Court has supplemental jurisdiction of New York State Law claims as the state law claims arose out of a common nucleus of facts as the federal claim involving the same parties so that they form the part of the same case or controversy under Article III of the United States Constitution.

14.     Venue in this district is proper as Defendants CWA Local 1101 and Defendant Verizon have their principal office locations in New York County (Manhattan), NY.  Defendant CWA Local 1101 has a principal office located at 350 W. 31st Street, 2d Fl., New York, NY 10001. Defendant Verizon has a principal office located at 140 West Street, New York, NY 10013.

STATUTE OF LIMITATIONS

15.     Based on *Vaca v. Sipes* 386 US 171 (1967) and its progeny of case law,  the time

limitation to file an action for breach of DFR is six (6) months from the date Plaintiff knew or

should have known of the union's actual breach of the duty of fair representation.  Fraudulent

concealment by the union of its bad faith conduct or breach of DFR tolls the statute of limitations

and the action accrues when the Plaintiff became discovered the  fraudulent conduct and

therefore knew or should have known about Plaintiff's cause of action for the union's breach of

DFR.  *See, Baskin v. Hawley* 807 F2d 1120 (2d Cir. 1986)

16.     The six (6) month statute of limitations for a duty of fair representation claim begins

when the plaintiff actually knew or should have known about the union's breach of this duty.

*See, Ramey v. District 141, I.A.M.*, 378 F.3d 269 (2d Cir., 2004)    December 2020 was the first

time Plaintiff discovered Defendant CWA Local 1101 breached its duty of fair representation.

Prior to December 2020, Plaintiff could not have known about this breach or other tortious

conduct by all named Defendants as they fraudulently concealed their bad faith conduct and

concealed the breach of their duties as employers that resulted in approximately five (5) years of

financial and economic damage to Plaintiff.  There was no way Plaintiff could have known

beyond conjecture that the union falsely denied receiving the recommendation for reinstatement

and Defendant Peters admitted terminating Plaintiff based on a legally protected status.

17.     In *Ramey*, the Second Circuit urged the District Courts to consider in a statute of

limitations and tolling analysis, the situation where employees of a bargaining unit legitimately

feel wary of taking legal action against a union that also represent them and protect their rights.

Id.  Moreover, the Second Circuit further urged the District Courts to consider in a statute of

limitations and tolling analysis that an employee is not allowed to bring a DFR action based on conjecture or speculation.  Id.

18.     Where a union fraudulently conceals their bad faith conduct and/or breach of their DFR, the six (6) months statute of limitations is tolled to when the Plaintiff discovers the fraudulent concealment or the breach of DFR by the union.  *See Baskin v. Hawley* 807 F2d 1120 (2d Cir. 1986)

19.     Defendant union had a strong motive to conceal its knowledge or awareness of the subject Verizon EEO recommendation to reinstate Plaintiff from the Plaintiff because it contradicted Defendant union's determination told to Plaintiff that her arbitration was non-meritorious.  The Verizon EEO recommendation rendered Plaintiff's arbitration meritorious.

20.     The Verizon EEO determination was profoundly damaging to the Defendant union's determination that Plaitniff's termination grievance/arbitration was non-meritorious.  Kathy Aiello of Verizon EEO stated to Plaintiff that she personally interviewed witnesses and conducted an investigation of Plaintiff's termination and determined that her complaint was "founded."  Ms. Aiello commented that there was "no way [Plaintiff] could have functioned in that type of environment with Veronica Peters retaliating against you."  Ms. Aiello also stated that Defendant Peters would be transferred to their Long Island office for Plaintiff to safely return to the Brooklyn office.  And because Defendant Peters was inextricably intertwined in this bad faith the Defendant union also concealed Defendant Peters bad faith conduct towards Plaintiff.

21.     For the first time on July 2020, Plaintiff was made suspect and placed on inquiry notice that the union may have breached its DFR and concealed its breach of DFR to represent her in her termination when she ran into a Defendant Verizon employee who told her "you were

supposed to come back to work [in 2015]."   On or about July 2020, Plaintiff by chance, encountered this employee of Verizon who worked with Plaintiff at Defendant Verizon's Brooklyn Location during the relevant time period, and was familiar with Plaintiff's termination and Defendant Peters.  This employee stated to Plaintiff, "you were supposed to come back to work."   However, this information was still speculative and conjecture at this point in time.

22.      Marlene Lee who was a union steward and regularly engaged in discussions with the union and management.  Without the information Ms. Lee provided to on or about that first week in December, Plaintiff could not have discovered with any amount of diligence, corroborating facts confirming that Plaintiff was discharged based on Defendant Peters' discriminatory animus toward Plaintiff; the union breached its DFR by refusing to take Plaintiff's termination to arbitration and Plaintiff was indeed recommended for reinstatement by Defendant Verizon EEO office and that the union fraudulently concealed this information.

23.      On or about the first week of December 2020, Plaintiff discovered the union's breach of DFR for failing to arbitrate her termination, that the union fraudulently concealed the Verizon EEO recommendation for re-instatement and the admission by Defendant Peters that she fired Plaintiff based on her discriminatory animus toward Plaintiff and that the union and Defendant Verizon were at all relevant times aware of the recommendation for reinstatement and Defendant Peters' malicious, discriminatory and bad faith conduct towards Plaintiff.

24.      Even if the Court should find there was no fraudulent concealment, Plaintiff's case is timely under the actual conduct standard vs. the announcement of a potential breach of DFR by the union. *See Ramey v. District* 141 I.A,M. 378 F3d 269 (2d Cir. 2004)  Defendant union's "announcement" to Plaintiff that it would not pursue Plaintiff's grievance past Step 3 of the grievance and arbitration procedure was not an actual breach of DFR.  Defendant had the right to

assess the merits of Plaintiff's grievance in 2015.  What the union did not have the right to do

was deny a meritorious grievance.  Defendant misled Plaintiff to believe that the union was not

in possession of the employer Defendant Verizon's recommendation for reinstatement of

Plaintiff and Plaintiff relied on that representation to believe that once the recommendation for

reinstatement was received, the issue would be resolved in Plaintiff's favor.  Thus, at least every

six (6) months, Plaintiff contacted the Defendant union inquiring as to whether or not they

received the recommendation for instatement of her employment from Verizon EEO.

25.     The Defendant union concealed the existence of the cause of action from Plaintiff and

additionally concealed the bad faith conduct of Defendant Peters and concealed the Defendants

collective scheme to terminate FMLA employees of color who were vested in their pension

plans.  Plaintiff promptly brought this cause of action within the applicable limitations period of

six (6) months upon learning of the cause of action and the Plaintiff's ignorance of the cause of

action did not result from a lack of diligence.  Plaintiff tirelessly and consistently sought to

recover information about her Verizon EEO recommendation for her reinstatement at least every

six (6) months with the union and after her chance meeting with a former co-worker on or about

July 2020 Plaintiff timely filed the instant action.

26.     On or about 2015 when the Defendant union denied Plaintiff's grievance past step 3 of

the grievance and arbitration procedure, specifically the union's refusal to proceed to arbitration

of Plaintiff's termination and denied any knowledge or information about Defendant Verizon's

EEO recommendation for reinstatement of Plaintiff, the Defendant union fraudulently concealed

the Defendant union's breach of DFR and misled Plaintiff to believe that the union's hands were

tied and did not have a meritorious grievance to proceed to arbitration.

27.     Upon learning of a viable claim on or about December 2020, Plaintiff filed the DFR

Claim on or about December 2020.  Even if it is found that Plaintiff first learned about her claim

on or about July 2020, Plaintiff's claim was still timely filed within the statutory time limit of six

(6) months from the date Plaintiff knew or should have known about the union's breach of DFR.

28.     On or about November 11, 2020, the funeral of Plaintiff's ex-husband opened a line of

discourse between Plaintiff and union shop steward Marlene Lee who was employed at the same

office of Defendant Verizon in 2015.  This event led to Ms. Lee's discussion with Plaintiff about

the union's breach of its duty to represent her during 2015 when it failed to arbitrate Plaintiff's

termination yet grieved all other employees' terminations.  Ms. Lee also revealed to Plaintiff that

Plaintiff was wrongfully discharged by Defendant Peters based on her animus of Plaintiff and for

taking paid time off under Family Medical Leave Act (FMLA).  Ms. Lee detailed that the pattern

of intentional, racist and damaging conduct of Defendant Peters who terminated Plaintiff and

other employees of African descent.  Ms. Lee disclosed that the union and employer were aware

of Defendant Peters' misconduct.  Ms. Lee was aware too of the racist comments about African

Americans that Defendant Peters regularly made such as "black people are lazy" and that

Defendant Peters stated "I love white people" as she replaced the people of color who she fired

based on Defendant Peters' racial animus with white employees.  Ms. Lee also stated that she

was confounded as to how Defendant Peters was openly engaging in discriminatory and hateful

conduct and maintained her position with the Defendant employer while Plaintiff was terminated

for suspensions and terminations imposed by Defendant Peters based on false pretenses.

Plaintiff had taken one sick day in 2015.

29.     The final suspension upon which Defendant Peters terminated Plaintiff on was based on

Defendant Peters' bad faith conduct.  Plaintiff was accused of leaving a customer on hold who

11

requested to speak with a supervisor.  Defendant Peters was next to Plaintiff at that moment but refused to take the call forcing Plaintiff to seek out another supervisor on the call center floor. The previous suspension was also imposed by Defendant Peters for her bad faith conduct. This previous suspension involved a customer engaged in a racist tirade against Plaintiff, culminating in the customer calling Plaintiff the "N" word prompting Plaintiff to find a supervisor on the call center floor to intervene on the call.  Defendant Peters imposed a suspension on Plaintiff for leaving the racist caller on hold for too long, notwithstanding Defendant Verizon's legal duty as the employer to protect employees from racial attacks or any other discriminatory attacks from the public on its employment premises.  The Defendant union refused to proceed to arbitration based on these suspensions imposed in bad faith by Defendant Peters.

30.     Plaintiff made diligent efforts to uncover whether or not the Defendant union received the Defendant Verizon's EEO recommendation to reinstate Plaintiff to her employment by contacting the union, speaking with union representatives at least, approximately every six (6) months since 2015.  Plaintiff's ignorance of her cause of action against the Defendant union was not due to her lack of diligence.

31.     Plaintiff could not have known prior to July 2020 of this inside information from Marlene Lee in Dec. 2020 and the employee Plaintiff by chance ran into at a Verizon store in July 2020 who stated that the union and employer knew Plaintiff was supposed to return to work.  Since on or about 2015, the union feigned ignorance by telling Plaintiff it was never in receipt of any reinstatement recommendation and that the Defendant Verizon was the one who denied her grievance.  On the other hand, Defendant Verizon by and through Kathy Aiello repeatedly told Plaintiff that it recommended Plaintiff's reinstatement to employment and that it relayed the information to the union. Many times, the union representatives misled Plaintiff to believe they

would look for the Defendant Verizons EEO determination only to respond to Plaintiff that the Defendant union was not aware of nor did it receive any such recommendation to reinstate Plaintiff.

32.     Plaintiff could not have known at any relevant time prior to 2020 that either the Defendant union and/or Defendant Verizon or Peters was fraudulently concealing Plaintiff's wrongful termination.

33.     From on or about June 2015, Plaintiff could not discern the break down in communications between the employer and the union.  At that time in June 2015 and thereafter, Plaintiff could not discern who was to blame as the union claimed it never received any recommendation for reinstatement and Verizon stated that it did.  Fearful of antagonizing either party with blame or legal action and only wanting to return to work, Plaintiff contacted the union approximately every six (6) months asking if they received the reinstatement information to which the union denied receiving every time, to date.

34.     After Defendant union told Plaintiff on or about 2015 that given Defendant Verizon's denial of the grievance, that they did not believe Plaintiff's grievance was meritorious to pursue any further to arbitration.    Plaintiff appealed to the national and international union during 2016 and the result was the same, that based on the information the local union forwarded to them, a further grievance / arbitration would not be meritorious.

35.     At all relevant times, the union denied receiving any information regarding a recommendation to re-instate Plaintiff from Defendant Verizon's EEO office that was issued on or about May 2015 detailed further *infra*, which Plaintiff repeatedly highlighted in her communications to the Defendant union, the international and national unions.

36.     Plaintiff was placed in an impossible situation as to taking legal action because she was kept guessing as to who the wrongful party was and did not want to antagonize either parties with legal action especially based on speculation and conjecture.  At all relevant times, Plaintiff reasonably held out hope that the union would ultimately receive the reinstatement recommendation and proceed to an arbitration or assist in any other way to have Plaintiff reinstated to her employment with Defendant Verizon.

37.     Based on New York State Law, the doctrine of estoppel bars a defendant's defense based on the ground of statute of limitations where the defendant fraudulently concealed his misconduct which has a statute of limitations of six (6) years. *See, Simcuski v. Saeli*, 44 NY2d 442 (NY Ct. of App.,1978)

38.     Under New York State law, fraudulent concealment of tortious conduct estops a defendant from raising the defense of the statute of limitations defense and imposes a six (6) year statute of limitations for fraud.  Therefore, all supplemental New York State law claims in this complaint are timely.  Regarding the tortious conduct claims in this Complaint, Plaintiff could not have known about Defendant Peters' admission that she terminated Plaintiff based on discriminatory animus until December 2020 through union steward Marlene Lee.  Plaintiff could not have known that the Defendant union did have knowledge of Defendant Verizon's recommendation for reinstatement until Plaintiff by chance met the Defendant Verizon employee who told her Plaintiff was supposed to come back to work.

39.     Approximately every six (6) months for the past five (5) years that Plaintiff inquired with Defendant CWA Local 1105 about the Verizon EEO recommendation for re-instatement, Defendant union falsely or recklessly denied receiving information from Defendant Verizon to

fraudulently conceal their bad faith conduct and breach of DFR of Plaintiff under the CBA. This also fraudulently concealed the bad faith conduct of Defendant Peters.

40.      Based on the foregoing, this Court should not allow any of the named Defendants to raise the defense of statute of limitations as Plaintiff could not have known this information without these chance disclosures on or about July 2020 and on or about December 2020.   Plaintiff also in good faith, diligently sought information regarding her reinstatement and as soon as she discovered this misconduct and actual breach of duties owed to her, from Ms. Lee on or about December 2020, Plaintiff promptly filed this Complaint.

41.      Defendants should further be estopped from raising the statute of limitations on the state law claims based on Plaintiff's discovery of fraudulently concealed information about Plaintiff's claims. On or about December 2020, during a discussion with Ms. Lee, Plaintiff discovered for the first time, there was an admission by Defendant Peters that she fired Plaintiff based on discriminatory animus toward Plaintiff.

42.      Prior to the discovery of this admission of Defendant Peters, Plaintiff's tort claims would have been based on speculation and conjecture.  Defendant union actively concealed Defendant Peters' bad faith conduct by ratifying Defendant Peters' bad faith and false suspensions and refusing to fully grieve meritorious grievances. Ms. Lee withheld this information from Plaintiff since on or about 2015 because she herself feared retaliatory conduct and termination by Defendant Peters.

43.      Based upon information and belief, it was not until on or about December 2020 that Ms. Lee was free of that fear of retaliation as she had transferred out of the New York office to a NJ office.   The fraudulent concealment was done by Defendant Peters with the aid of Defendant union as she silenced the members of this bargaining unit with threats of reprisals and retaliatory

discharge which the bargaining unit members witnessed Defendant Peters get away with and mete out openly and notoriously with impunity.

44.     Defendants cannot genuinely claim a rationale for statutory bar to any of Plaintiff's claims because witnesses have moved away or memories faded so that the time limitation should apply.  Ms. Lee and the other Verizon employee Plaintiff ran into on or about July 2020 are both currently Verizon employees and witnesses to the events on or about 2013 through 2015. Defendant Peters is still employed with Defendant Verizon.  These witnesses' memories have evidently not faded and they are still in contact with Defendant Verizon and the union. Moreover it has been less than six (6) years since Plaintiff was terminated from employment. Pursuant to New York State Labor Law (NYLL), Defendant Verizon is required to keep employment records for a minimum of six (6) years.   The statute of limitations for fraudulent concealment is also six (6) years.  For these reasons, Defendants are estopped from raising the statute of limitations defense to any of the New York state law claims.

THE PARTIES

45.     Lisa Tilley ("Plaintiff") was a call center employee of Defendant Verizon at its Queens, New York location from on or about 1999.  From on or about 2009 through on or about April 1, 2015 Plaintiff worked at Defendant Verizon's Brooklyn office.  Plaintiff did not have breaks in service, and was fully vested in her pension at the time she was terminated from her employment.

46.     At all relevant times, Plaintiff was a member of the collective bargaining unit exclusively represented by Communication Workers of America, Local 1101 as successor and formerly known as Local 1105 ("Defendant CWA Local 1101" or "Defendant union") pursuant to 29 USC §159 (a).   During the relevant time period, Keith Edwards was Local union 1101 president and

replaced by Christopher Shelton on or about June 2015.  CWA Local 1101 has a principal address of 350 W. 31st Street, 2d Fl., New York, NY 10001.

47.     Plaintiff reported to a supervisor named Veronica Peters ("Defendant Peters") from on or about 2012 through the date of Plaintiff's wrongful termination from her employment with Verizon by Defendant Peters on or about April 1, 2015.  Based upon information and belief, Defendant Peters was transferred from Defendant Verizon's Staten Island office on or about 2012 due to bad faith conduct.  Based upon information and belief, Defendant Peters allowed an expensive television that was earmarked as a prize for an event to go to her favored male employee without entitlement to the that prize.

48.     Defendant Verizon is a national telecommunications / wireless phone and internet provider with a principal location at 140 West Street, New York, NY 10013.  Since at least on or about 2015, Defendant Verizon maintained an internal Equal Employment Opportunity office ("Verizon EEO") that also investigated discrimination complaints by their employees.  Based upon information and belief, Verizon EEO makes recommendations to the Defendant union based upon their internal investigations.  Based upon information and belief, Kathy Aiello worked for Verizon EEO as a manager in that division during 2015 out of Defendant Verizon's Lowell, MA office.

## FACTUAL ALLEGATIONS

49.     Based upon information and belief, on or about April 1, 2015 after Plaintiff's termination, Defendant Peters stated to union steward Marlene Lee, that she succeeded in firing Plaintiff and planned to fire other employees for taking paid time off pursuant to the Family Medical Leave Act ("FMLA").   This admission was revealed to Plaintiff during a conversation with Marlene Lee on or about first week of December 2020.

50.     On or about the first week of December 2020 Plaintiff was made aware that Defendant

union failed to fully grieve and arbitrate Plaintiff's termination during 2015.  Union steward

Marlene Lee finally disclosed to Plaintiff on or about December 2020 that the union should have

fully grieved Plaintiff's termination as it did for all the other employees when they were

terminated from employment especially because Defendant Peters discharged Plaintiff based on

discriminatory animus that Defendant union was aware of.

51.     Based upon information and belief, Defendant union falsely claimed they did not receive

this recommendation to reinstate Plaintiff in order to fraudulently conceal Defendant union's

breach of the duty of fair representation refusing to arbitrate Plaintiff's meritorious termination.

To acknowledge the Verizon EEO recommendation to re-instate Plaintiff would have

contradicted the basis for union's decision not to proceed to arbitration because the union

fraudulently deemed it non-meritorious.

52.     Based upon information and belief Defendant union intentionally misled Plaintiff into

believing that they never received such recommendation for re-instatement detailed *supra* to

conceal their breach of the duty of fair representation ("DFR") of Plaintiff.

53.     On or about April 15, 2015, Plaintiff had filed a discrimination and retaliatory discharge

complaint against Defendant Peters with Defendant Verizon's EEO office.  On or about May

2015, Kathy Aiello of Defendant Verizon's EEO office informed Plaintiff that her complaint was

founded and it recommended Plaintiff's reinstatement.  Ms. Aiello further instructed Plaintiff to

contact the union who had this reinstatement information.  When Plaintiff contacted the union,

the union denied ever receiving any reinstatement information.  Shortly thereafter, Plaintiff

contacted Ms. Aiello again and Ms. Aiello reiterated that the union was given the re-instatement

information.  Shortly thereafter, Plaintiff contacted the union again and the union reiterated they

had no such information. Shortly thereafter,   Plaintiff contacted Ms. Aiello again and Ms. Aiello repeated that Plaintiff's complaint was founded, she was recommended for reinstatement and to contact the union who has the information.

54.     During the May 2015 call from Verizon EEO's Kathy Aiello to Plaintiff, Ms. Aiello told Plaintiff that she personally conducted the investigation of her EEO complaint filed on or about April 15, 2015 and interviewed witnesses.  Ms. Aiello informed Plaintiff that her complaint was founded and commented that that there was "no way you could have functioned in that type of environment with Veronica Peters retaliating against you."  Ms. Aiello further informed Plaintiff that Defendant Peters would be transferred to the Long Island office so that Plaintiff could safely return to the Brooklyn office.

55.     On or about the first week of December 2020, Plaintiff by chance spoke with Marlene Lee, also a Verizon employee and union steward at the same Brooklyn office during 2015.  Ms. Lee explained that Plaintiff's termination was wrongful in 2015 and that the union should have fully grieved Plaintiff's grievance as the union grieved all other employees' termination.  Ms. Lee also detailed that Defendant Peters named Plaintiff as one of the employees who Defendant Peters stated she successfully fired and was going to have fire other employees of color also for taking paid time off under FMLA.  Ms. Lee also stated Defendant Peters stated that black people were lazy and that she loved white people and replaced terminated employees with white employees.   Plaintiff is an American of African ancestry.

56.     Based upon information and belief, during all relevant times to date, Defendant Peters had two or more complaints made against her for harassment against other employees of African descent.  Defendant Peters repeatedly stalked and harassed Plaintiff with racial slurs and comments to Plaintiff since on or about 2012.

57.     On or about 2012, Defendant Peters baselessly called security to have Plaintiff maliciously and physically ejected from the Defendant Verizon office.  Plaintiff had taken vacation days off upon proper notice but Defendant Peters falsely alleged Plaintiff abandoned her job and failed to appear at work.

58.     Based upon information and belief, Defendant Peters' intent was to vicariously commit an assault on Plaintiff through security officers.   Defendant Peters also tortiously interfered with Plaintiff's employment relationship with Defendant employer Verizon and the union when Defendant Peters maliciously and wrongfully suspended Plaintiff for approximately sixty (60) days and terminated Plaintiff in 2015 based on false pretenses and thereafter blocked or convinced the union to rely on Defendant Peters' suspensions and terminations and prevented the filing of grievances and arbitrations on behalf of Plaintiff.

59.     At all relevant times Defendant Verizon knew or should have known about Defendant Peters' pattern of misconduct and negligently hired, retained and allowed Defendant Peters to continue her pattern of race based and other discriminatory misconduct against Plaintiffs and other employees of African descent.

60.     Plaintiff was employed by Defendant Verizon from on or about 1999 through on or about March 2015 and fully vested in Defendant Verizon's pension plan operated by Defendant union. At all relevant times, Plaintiff was a customer service representative at Defendant Verizon's call center located in Brooklyn, New York.  Since on or about 2012, Plaintiff was supervised by Defendant Peters.

61.     From on or about 2012, Defendant Peters repeatedly and systematically harassed and attempted to terminate Plaintiff and regularly abused Plaintiff with racist comments.  Plaintiff is an American of African descent.  Defendant Peters often commented to Plaintiff that "black

people were lazy."  This comment was also heard by union steward Marlene Lee, co-worker

Kendall Moultrie and many other African American female employees at the Brooklyn office.

Defendant Peters further commented regularly to and about Plaintiff to other employees such as

Marlene Lee that Plaintiff "did not raise her son" and that Plaintiff had a "baby daddy" when it

was patently untrue.  Defendant Peters was aware that Plaintiff had an ex-husband with whom

Plaintiff had a son.

62.     On or about 2012, Plaintiff took vacation days upon proper notice to the Defendant union

and employer.  Upon Plaintiff's return to work, Defendant Peters called the building security

personnel to physically eject Plaintiff from the work premises alleging that Defendant Peters had

fired Plaintiff for job abandonment.  Security was informed by Plaintiff that she had been on

vacation that the union and employer were aware of in advance and Security determined that

Defendant Peters was mistaken and refused to eject or escort Plaintiff off the work premises.

Security's refusal to physically eject Plaintiff from the subject premises enraged Defendant

Peters.  Defendant Peters imposed approximately a sixty (60) day suspension without pay even

though Plaintiff did not engage in any wrongdoing.  Thereafter, Defendant Peters now enraged,

set out on a continuous and relentless campaign to have Plaintiff terminated from Defendant

Verizon.

63.     Based upon information and belief at or about this time Defendant Peters was

romantically involved with Defendant union executive Bobby Shannon.  Based upon information

and belief due to this relationship rife with conflicts of interest, the union further cooperated with

Defendant Peters' misconduct against Plaintiff.

64.     On or about 2013, Plaintiff's teenage son suffered a violent physical attack.  As a result

of this incident, Plaintiff suffering from emotional stress, had an accident that cause her to hit her

head which required an emergency room visit.   Plaintiff was out from work that one day during

on or about 2013 and that one day was an already authorized vacation day.  Defendant Peters

was aware that Plaintiff was being treated by a therapist and on or about 2013, Defendant Peters

contacted the therapist inquiring about Plaintiff's whereabouts in violation of HIPAA.   This was

to set up Plaintiff as having abandoned her job so that Defendant Peters could suspend Plaintiff

for not reporting to work.

65.     During on or about 2012, a customer called in to Defendant Verizon call center and

engaged in an unprovoked racist tirade against Plaintiff and threatened Plaintiff calling Plaintiff

the "N" word.  Plaintiff put the customer on hold to find a supervisor to intervene.  Defendant

Peters, in violation of Plaintiff's rights, suspended Plaintiff despite the customer's threat and

racist comments because Defendant Peters determined that Plaintiff left the customer on hold for

five (5) minutes which she told Plaintiff was too long.

66.     Defendant CWA Local 1105 was aware of this incident with the racist caller and at first

Defendant union stated they would defend Plaintiff for the racist attack but ultimately, Defendant

CWA Local 1105 declined because the Defendant union outrageously adopted Defendant Peters'

suspension of Plaintiff for putting the offensive customer on hold for five minutes which was too

long according to Defendant Peters notwithstanding the racist verbal attacks and threats made to

Plaintiff.  Defendant CWA Local 1105 also did not grieve this suspension, maliciously and

willfully adopting and concealing Defendant Peters' racial animus towards the Plaintiff.

67.     On or about 2015, Plaintiff was on a call with a customer who asked for a supervisor.

Defendant Peters was next to Plaintiff at the time but intentionally and willfully refused to take

the call and forced Plaintiff to find another supervisor on the floor.  Plaintiff was terminated for

this incident for allowing the customer to hold too long even though Defendant Peters was right

next to Plaintiff and aware that the customer requested to speak with a supervisor. Thereafter, Plaintiff was wrongfully terminated from her employment with Defendant Verizon on or about April 1, 2015.   Defendant union failed to grieve Plaintiff's termination beyond step 3 of the grievance and arbitration procedures under the CBA citing Defendant Verizon's denial of the grievance which was based on Defendant Peters' false and pretextual suspension of Plaintiff. Thereby, Defendant union again concealed Defendant Peters' malicious and bad faith conduct.

68.    At all relevant times, Plaintiff was not aware that Defendant union breached its DFR because the Defendant union appeared to abide by the CBA and told Plaintiff that her grievance was non-meritorious.  Plaintiff being non-confrontational by nature did not want to bring legal action against the Defendant union who was supposed to represent and assist her under the CBA.

69.    During all relevant times of Plaintiff's employment with employer, Defendant union concealed their breach of DFR to represent Plaintiff by stating Plaintiff did not have a meritorious defense to her suspension and termination by Defendant Peters.  Whenever Plaintiff requested assistance from Defendant union it denied Plaintiff any assistance and adopted and concealed Defendant Peters' animus towards Plaintiff.

70.    On or about April 15, 2015 Plaintiff filed a discrimination and retaliatory termination claim with Verizon's EEO office, Complaint No. EEO # VER-15-04-0103.  On or about May 2015, Plaintiff received a phone call from Kathy Aiello from Defendant Verizon's EEO office. Ms. Aeillo informed Plaintiff that Plaintiff's complaint was founded and that it was recommended that Plaintiff should be re-instated to her employment with Defendant Verizon. Ms. Aiello also informed Plaintiff that her transfer to Defendant Verizon's Long Island office was granted.  Ms. Aiello further instructed Plaintiff to contact the union because they had the reinstatement recommendation information.

71.     As instructed, Plaintiff contacted union steward Patty Egan and Liz Mercado who worked at the Defendant union's offices on separate occasions during on or about June 2015 about her reinstatement.  Both Ms. Egan and Ms. Mercado told Plaintiff that they did not receive any information about her reinstatement from Verizon EEO.  In turn, Plaintiff called Ms. Aiello yet again at Verizon's EEO office stating that the union did not receive information about her reinstatement.  Ms. Aiello again and sounding increasingly impatient and irritated, repeated to Plaintiff that her complaint was founded, she was recommended for reinstatement and the union should have this information.  Plaintiff again called the Defendant union and again the union repeated that they had no such communication or information from the Defendant Verizon EEO office.

72.     The last and third time Plaintiff called Ms. Aiello, on or about June 2015, Plaintiff was met with an impatient and irritated Ms. Aiello who repeated unequivocally that the union had this information and Plaintiff needed to contact them.  Plaintiff did not want to further anger Defendant Verizon and sabotage her employment so she continued to contact the Defendant union.  Since 2015, Plaintiff has called the union approximately every six (6) months per year asking if the union had her reinstatement information and every year, Defendant union repeated they did not.

73.     On or about November 11, 2020, Plaintiff's ex- husband passed away and services were held at a church he regularly attended.  Ms. Marlene Lee attended this same church and heard about the funeral service for Plaintiff's ex-husband and reached out with condolences to Plaintiff on Facebook's social media platform.  Ms. Lee was also an employee at Defendant Verizon and was a union steward at the Brooklyn office at or about the time Plaintiff was terminated from her employment on or about March 2015.  During that time, Plaintiff and Ms. Lee did not engage in

workplace discussions as they were not well acquainted.  During that time, Ms. Lee was also aware of and subject to Defendant Peters' racist wrath and bad faith conduct against people of color in the workplace so Ms. Lee could not disclose any information to Plaintiff about Defendant Peters that would jeopardize Ms. Lee's job.  By chance, a line of discourse between Plaintiff and Ms. Lee opened due to this event.  On or about the first week of December 2020, Plaintiff and Ms. Lee discussed Plaintiff's termination in 2015.

74.     On or about the first week of December 2020, Ms. Lee disclosed to Plaintiff that after Plaintiff was terminated, Defendant Peters verbally stated a list of people who Defendant Peters sought to get fired or successfully fired for taking paid days off under the Family Leave Act (FMLA).  Ms. Lee further disclosed that Plaintiff was one of the employees that Defendant Peters named and succeeded in terminating.  Ms. Lee also stated that the other named employees were terminated as well.  These people of color were replaced by white employees.  And when Defendant Peters was called out on this racist behavior, she stated, "I love white people" as she replaced black employees with white employees.  Ms. Lee told Plaintiff that the union knew about Defendant Peters' racist and bad faith conduct and should have fully grieved Plaintiff's termination as they did for all other employees who were terminated.

75.     At all relevant times Defendant Verizon had control and supervision over Defendant Peters and was aware of Defendant Peters' animus towards Plaintiff but enabled Defendant Peters to continue a pattern of discriminatory conduct that damaged Plaintiff and other African American employees, particularly African American female employees.  As a result, Plaintiff experienced severe emotion distress, the loss of her job and benefits and her reputation. Defendant Peters routinely stated to Plaintiff and co-workers that Plaintiff "did not raise her son"

and that Plaintiff had a "baby daddy" both of which were patently false and malicious statements.

76.     Based upon information and belief Defendant Peters economically benefitted Defendant Verizon as Defendant Peters systematically did the "dirty work" for Defendant Verizon to rid their payroll of employees who dared to properly take paid sick days, vacation and/or sick leave under the subject CBA.  Most importantly, Defendant Peters set up and terminated based on false pretenses, employees who were fully vested in the subject pension plan.  Defendant Verizon obtained a windfall of pensions they no longer had to pay.  Defendant union could not care less as the number of dues paying employees and Defendant Verizon's hourly contributions to the subject pension, health and welfare plan remained unchanged.

<u>Union's Duty of Fair Representation Pursuant to 29 USC §185</u>

77.     During all relevant times to on or about June 2015, Keith Edwards was the president of Defendant union.  After on or about June 2015, Christopher Shelton was president of Defendant union.   At all relevant times Pursuant to 29 USC §185, Defendant union had the duty to represent all collective bargaining unit members including Plaintiff fairly, and in good faith pursuant to the CBA for all matters affecting the terms and conditions of employment with the employer Defendant Verizon.

78.     Based upon information and belief, Keith Edwards was the subject of discrimination claim(s) against the Defendant union and stepped down from his position on or about June 2015.

79.     Defendant union had at all relevant times, a duty to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.  Union conduct that is arbitrary, discriminatory or in bad faith violates the duty of fair representation ("DFR").  *See*, *Vaca v. Sipes*, 386 US 171 (1967)

80.     A union violates the DFR when it refuses to grieve and/or arbitrate based on personal animosity and bad faith.  The Defendant union condoned, ratified and concealed Defendant Peters' racist and retaliatory termination of Plaintiff that even Verizon EEO recommended against.  Also, according to Marlene Lee, Plaintiff was on Defendant Peters' "hit list" of employees to terminate for taking FMLA leave.  Ms. Lee was a union steward and aware of the hit list.  Based on fear and oppression Ms. Lee further concealed Defendant Peters' repeated and continuous bad faith conduct toward Plaintiff and other African American female employees. The union also overlooked critical facts and witnesses surrounding Defendant Peters' discriminatory misconduct such as the Verizon EEO recommendation for reinstatement of Plaintiff's employment.

81.     The union violates the DFR when it allows time limits for filing and processing grievances and submitting them to arbitration.  When a union ignores a grievance and allows the time period to lapse, a violation of the DFR occurs if the grievance has merit.  *See, Foust v. IBEW*, 442 US 42 (1979)

82.     Defendant union deliberately and in bad faith allowed the time limit to file a grievance/arbitration under the CBA to lapse and failed to file Plaintiff's meritorious grievance for her termination which was evidenced by the May 2015 Verizon EEO recommendation of re-instatement of Plaintiff to her employment.

83.     Defendant union deliberately and intentionally told Plaintiff that they never received any such information from the Defendant Verizon's EEO office to fraudulently conceal their breach of the DFR and to gaslight Plaintiff into believing that Plaintiff was mistaken about the existence of her recommendation for her re-instatement of employment with Defendant Verizon.

84.     This scheme between the Defendants to make pretextual discharges of African American female employees with vested pensions benefitted all parties including the union.   The obvious benefit to Defendant Verizon was it saved money in pension pay-outs for long term, vested employees.  Plaintiff Tilley had over six (6) years of employment with Defendant Verizon. Kendall Moultrie who was also on Defendant Peters' FMLA termination list had approximately sixteen (16) years of employment with Defendant Verizon.  The scheme benefitted the Defendant union because even though it loses older vested pension employees, it gains new employees hired to replace the terminated employees for union dues payments, and the hourly contributions made into the Defendant union's pension, health and welfare plans by Defendant Verizon remain unchanged with the replacement by new employees.  The scheme benefitted Defendant Peters as she was "useful" to both the employer and union by firing vested pension employees of color who Defendant Peters believed racially inferior and would not be able to resort to any legal rights and remedies.  And based upon information and belief, Defendant Peters replaced employees of color with white employees.

85.     Based upon information and belief, Plaintiff was subjected to racist characterizations and comments by management about Verizon's NYC employees who were majority people of color. Management, by and through Defendant Peters voiced daily, their attitude and belief that African American employees reduced productivity and efficiency of the company because they were "lazy" and/or dared to take paid sick time or receive their hard-earned pension benefits or any hard-earned benefit.

86.     Based upon information and belief, the Defendant union starved its locals to integrate into the larger CWA labor organization with labor strikes in violation of the CBA that caused the permanent termination of those bargaining unit members who engaged in the strike(s).

87.     Based upon information and belief, CWA union local 103 which took over the technical workers from Local 1105 were organized to strike in violation of the CBA and the technical workers were never allowed returned to work.  Defendant union purposely allowed their constituents to be terminated to the windfall benefit of Defendant Verizon.  Based upon information and belief, the call center employees from Local 1105 were transferred to Local 1101 and the scheme to terminate the older vested pension employees was to demote promoted employees to call center work who could no longer tolerate the stresses of that work.  Based upon information and belief, these demoted bargaining unit members were then suspended on false pretext by Defendant Peters and then terminated.  Based upon information and belief, the Defendant union in turn, stood back and told the employee there was nothing they could do based on those suspensions and engaged in this scheme of terminating pension vested employees of color with meritorious grievances and arbitrations as they did to Plaintiff.

88.     Labor organizations are legally charged with the duty to represent socio-economically disadvantaged employees equally with all other bargaining unit members.   Today, it is open and notorious that African American women are the most openly discriminated against.  Ageism and health issues compounded an already heavy burden of being an African American woman in the workplace, which virtually made Plaintiff's survival in the workplace impossible and ultimately just another racist statistic.  As set forth previously, Defendant Peters' FMLA termination list penalized employees of color, mostly African American female employees for daring to take care of their health.  The Defendants capitalized on this racist cycle of oppression of African American women in the workplace.  Ironically, Defendant Peters racialized the workplace with her daily and regular racist comments and conduct.  Plaintiff performed commendable work even despite Defendant Peters' harassment.

89.     At all relevant times Plaintiff simply wanted to work to care for her family and but-for Defendant Peters' bogus, pretextual and outright false bases for suspensions of Plaintiff and the Plaintiff would have remained at her job with earned pay and pension, health and welfare benefits.

Defendant Peters' Repeated Malicious and Retaliatory Conduct to wrongfully discharge Plaintiff

90.     At all relevant times since on or about 2012 to 2015, Defendant Peters was the supervisor for Plaintiff at the Defendant Verizon office located in Brooklyn, NY.

91.     On or about May 2015 Ms. Aiello from Verizon EEO who personally conducted interviews of witness and the investigation of Plaintiff's termination on or about April 1, 2015, stated to Plaintiff that there was "no way [Plaintiff] could have functioned in that type of environment with Veronica Peters retaliating against you."

92.     At all relevant times. Defendant Peters engaged in repeated harassment and made offensive comments to Plaintiff about Plaintiff's Black American or African heritage by for instance commenting that Plaintiff had a "baby daddy" and "did not raise her son" and that black people were lazy and that Defendant Peters without being asked commented to Plaintiff that she only dated white men.

93.     On or about 2014, Defendant Peters suspended Plaintiff again for one day without pay when Plaintiff was out on vacation days.  Plaintiff won this grievance as Plaintiff was indeed legitimately out on a vacation day but this enraged Defendant Peters who stated to Plaintiff that Plaintiff wrongfully accepted the result of the grievance in her favor because Defendant Peters correctly suspended her for unreliability.  The union also warned Plaintiff that Defendant Peters does not like to lose a grievance.

94.     Based upon information and belief, on or about 2015, a supervisor named Mr. Rahman was terminated from Defendant Verizon.  Mr. Rahman confessed to Plaintiff and advised the union that he was directed by Defendant Peters to wrongfully suspend Plaintiff on at least two occasions and that Defendant Peters held personal animosity towards the Plaintiff.  Mr. Rahman further advised the union that Plaintiff was one of his highest performing employees.

95.     Based upon information and belief, on or about April 24, 2015, Latisha Pinkney-Warfield, former employee of Defendant Verizon and a former union steward of Defendant union, and former co-worker of Plaintiff wrote to the Defendant union detailing how Defendant Peters was racist against Black Americans who Defendant Peters commented were "lazy" and that Defendant Peters' "newest conquest" was the "firing of Lisa Tilly."  Ms. Pinkney Warfield further detailed that Defendant Peters terminated other employees based on their African racial heritage and Ms. Pinkney-Warfield was also maliciously and wrongly accused and terminated by Defendant Peters for theft of sales opportunities.   Ms. Pinkney-Warfield detailed how Defendant Peters routinely crossed personal boundaries with other black female employees who were privately suffering with personal issues.  Ms. Pinkney-Warfield transferred to Defendant Verizon's offices in Maryland out from under the auspices of Defendant Peters and Defendant union.  On or about 2002, Defendant Peters egregiously crossed Ms. Pinkney-Warfields boundaries when Defendant Peters made a personal trip to Maryland to disparage Ms. Pinkney-Warfield's character to Defendant Verizon management at their Maryland offices.

96.     Plaintiff was subjected daily to un-invited, unsolicited, offensive and inappropriate comments by Defendant Peters including but not limited to "black people are lazy,"  " I love white people,"  "I only date white men."  Defendant Peters further subjected Plaintiff to regular personal attacks including but not limited to, "you didn't raise your son;" "you are lazy;" and

said Plaintiff had a "baby daddy" implying without a basis in fact that Plaintiff was a single

black mother.  This was patently false as her son was born out of a marriage to Plaintiff's spouse

who passed away on or about November 11, 2020.

97.     Based upon information and belief, Defendant Peters was involved in a romantic

relationship with Defendant union's executive Bobby Shannon during the relevant time period.

Based upon information and belief, this romantic relationship allowed Defendant Peters to

engage in misconduct that was regularly overlooked, condoned, ratified and/or adopted  by the

union and the union breached its DFR by failing to grieve Plaintiff's termination, suspension

without pay or any other complaints about the terms and conditions of Plaintiff's employment

arising out of Defendant Peters' misconduct.

98.     The Defendant union also breached its DFR when it refused to grieve the Plaintiff's

suspension without pay by Defendant Peters on or about 2012 for placing a customer's call on

hold spewed racial slurs and comments at Plaintiff without provocation and specifically

threatened Plaintiff and called Plaintiff the "N" word.   Plaintiff had a meritorious grievance as

the Defendant Verizon, as the employer had a duty to protect Plaintiff against racial harassment

by customers or the public in workplace by state and federal law and the CBA.  The union

overlooked their own determination that the customer on this call unjustifiably attacked Plaintiff

with racial slurs and threats and ratified or condoned Defendant Peters' retaliatory suspension of

Plaintiff for placing the racist and hostile customer on hold to find a supervisor on the call center

floor to take over the call.

99.     On or about October 2012, without Plaintiff's notice or opportunity to be heard,

Defendant Peters attempted to physically eject and humiliate Plaintiff from the workplace

premises and called building security to eject Plaintiff from the premises of Defendant Verizon.

After failing to have Plaintiff fired for a racist caller who was put on hold, that Defendant Peters deemed was too long, Defendant Peters attempted to fire Plaintiff on the pre-text that she was out on an unauthorized vacation day. After the Plaintiff spoke with security, security determined they had no basis to remove Plaintiff from the premise.  This enraged Defendant Peters who placed Plaintiff on a six (6) week suspension regardless, without pay, in retaliation for not submitting to a physical ejectment from the workplace premises.  The union refused to grieve this unlawful conduct by Defendant Peters as the Defendant union gas-lit  Plaintiff to believe that Defendant Peters had the right to suspend her for leaving a hostile and racist customer on hold for too long, and Defendant union only acted upon the purportedly legitimate suspension.

100.    Defendant Verizon knew or should have known that Defendant Peters was engaging in racially hostile misconduct against Plaintiff and other black female employees of Defendant Verizon's Brooklyn office.  As set forth supra, on or about April 15, 2015 Defendant Verizon received an EEO complaint claiming discrimination by Defendant Peters, from Plaintiff which Verizon EEO determined was founded and in turn, recommended reinstatement of Plaintiff's employment.

101.    Based upon information and belief, on or about 2015, employee Pinkney-Warfield communicated to the union that she purposely transferred to Defendant Verizon's Maryland offices to escape the discrimination and hostile environment created by Defendant Peters.  On or about 2015 prior to the termination of Plaintiff, Mr. Rahman, upon his termination as one of Plaintiff's supervisors communicated to Human Resources of Defendant Verizon that Defendant Peters directed him to suspend Plaintiff without pay on at least two occasions based on false pretenses.  Mr. Rahman stated that Defendant Peters harbored an intense animosity towards Plaintiff.

102.     Based upon information and belief, on or about 2012, Adrian Johnson, an employee of Defendant Verizon at the Brooklyn office took legal and/or administrative action against Defendant Peters for discrimination and harassment of Ms. Johnson because she was a black female employee.

103.     On or about March 2015, prior to Plaintiff's termination from employment, Plaintiff requested a transfer to Defendant Verizon's Long Island, NY office.  On or about May 2015 when Plaintiff was notified by Defendant Verizon's EEO office that she was recommended for reinstatement of employment, Plaintiff was also notified that Defendant Verizon would transfer Defendant Peters to the Long Island office so that Plaintiff could safely return to the Brooklyn office.

104.     On or about July 2020, Plaintiff by chance met a current employee of Verizon at a Verizon store in NYC.  This employee who was acquainted with Plaintiff since on or about 2009, worked at the Brooklyn office too, and asked Plaintiff why Plaintiff never returned to work because as she stated to Plaintiff, "you were supposed to be back a long time ago."

105.     Based on the chance encounters in July 2020 and December 2020 there is a strong an clear inference that the union fraudulently concealed their breach of DFR of Plaintiff as well as Defendant Verizon's negligent hiring and retention of Defendant Peters, and Defendant Peters' wrongful discharge of Plaintiff and other tortious misconduct inflicted on the Plaintiff.

<u>AS AND FOR THE FIRST CAUSE OF ACTION FOR BREACH OF THE DUTY OF FAIR REPRESENTATION (DFR) BY DEFENDANT CWA LOCAL 1101</u>

106.      Plaintiff repeats and re-alleges each and every allegation previously set forth as if fully set forth herein.

107.     At all relevant times, Defendant union represented Plaintiff as a member of the subject collective bargaining unit pursuant to the CBA with the Defendant Verizon.

108.    Defendant union breached its DFR to represent Plaintiff, a member of the subject collective bargaining unit pursuant to the CBA with the Defendant Verizon, fairly and in good faith without bias or animus toward any Plaintiff, in the terms and conditions of employment of the bargaining unit employees when it denied arbitration of Plaintiff's termination as non-meritorious when it was aware that Verizon EEO issued a recommendation for re-instatement that rendered Plaintiff's termination as a meritorious grievance which contradicted the union's determination.

109.    Defendant union breached its DFR when it assisted Defendant Peters in concealing her bad faith conduct, e.g. suspensions and termination of Plaintiff based on false pretenses.

110.    The Verizon EEO determination was profoundly damaging to the Defendant union's determination that Plaitniff's termination grievance/arbitration was non-meritorious.  Kathy Aiello of Verizon EEO stated to Plaintiff that she personally interviewed witnesses and conducted an investigation of Plaintiff's termination and determined that her complaint was "founded."  Ms. Aiello commented that there was "no way [Plaintiff] could have functioned in that type of environment with Veronica Peters retaliating against you."  Ms. Aiello also stated that Defendant Peters would be transferred to their Long Island office for Plaintiff to safely return to the Brooklyn office.

111.    Because Verizon EEO's determination was so damaging to Defendant union, it then fraudulently concealed this breach of DFR by misleading Plaintiff to believe the Defendant union never received any such Verizon EEO recommendation for re-instatement.  Defendant union also fraudulently concealed Defendant Peters' bad faith conduct and her FMLA termination list when it was fully aware of Defendant Peters' repeated and continuing pattern of

misconduct and did nothing or told complaining bargaining unit members there was nothing it could do for them because of these bad faith suspensions.

112.    On or about 2015, Defendant breached its DFR by denying Plaintiff's grievance of the termination of her employment past the step 3 phase of Plaintiff's grievance in bad faith. Plaintiff informed Defendant union since on or about May 2015 to date that Verizon EEO recommended reinstatement of her employment.   Each time Plaintiff communicated to the union about the reinstatement recommendation, Defendant union denied knowledge or receipt of any such reinstatement recommendation or information about it.

113.    Based upon information and belief, Defendant union denied knowledge or receipt of any such reinstatement recommendation in order to conceal its breach of DFR when it denied Plaintiff her grievance past step 3 of the grievance procedure under the CBA.   Based upon information and belief, Defendant union did not at any time have any intention to contravert a discharge by Defendant Peters.

114.    Based upon information and belief, union steward Patty Egan warned Plaintiff on or about 2012 that Defendant Peters does not like to lose a grievance.  Defendant union adopted Defendant Peters' discriminatory animus toward Plaintiff and denied Plaintiff's arbitration of her termination.

115.    Defendant union was aware at all relevant times that Plaintiff should have been reinstated to her employment contrary to the wishes of Defendant Peters.  Defendant union was also aware at all relevant times that on or about March 2015, Plaintiff was granted a transfer to Defendant Verizon's Long Island office but was terminated by Defendant Peters on or about April 1, 2015 and Defendant Peters transferred to the Long Island office instead.  Defendant union was at all relevant times aware of Defendant Peters' animus toward Plaintiff and ratified Defendant Peters'

actions by declining to grieve Defendant Peters' termination of Plaintiff. The Defendant union did nothing to represent, defend or protect Plaintiff as a bargaining unit member. The Defendant union however joined in Defendant Peters' hostility and animus toward Plaintiff.

116.    Defendant union vicariously acted with animus toward Plaintiff by denying Plaintiff's arbitration of her termination which would have challenged Defendant Peters' firing of Plaintiff; and fraudulently concealed its breach of DFR by feigning innocence of knowledge of any reinstatement recommendation because such recommendation would have rendered the arbitration meritorious and would have contradicted Defendant's 2015 denial of the arbitration as non-meritorious.

117.    On or about 2012 and 2014, Defendant Peters maliciously and without a factual basis, imposed on Plaintiff, suspensions without pay for approximately sixty days in 2012 and 30 days in 2014. Defendant union failed to grieve or challenge Defendant Peters' imposition of suspensions without pay. In 2015 a supervisor, Mr. Rahman admitted that Defendant Peters directed him to suspend Plaintiff without pay because Defendant Peters harbored an animus toward Plaintiff. Mr. Rahman stated to Plaintiff that Plaintiff was one of his highest producing employees and that he was fired because he refused to continue to suspend Plaintiff as directed by Defendant Peters. These suspensions were similarly based on Defendant Peters' animus toward Plaintiff which Defendant union overlooked and/or ratified and therefore breached its duty of fair representation for failure to grieve these maliciously and unjustified suspensions by Defendant Peters.

118.    On or about 2015 Defendant Union was aware of Latisha Pinkney-Warfield, a former union steward, 2015 letter that expressly warned them that Defendant Peters was a racist against black women, that Defendant Peters harbored racial animus towards Plaintiff by stating that

Defendant Peters latest "conquest" was the "firing of Lisa Tilley." Defendant union did nothing and joined in Defendant Peters' hostility and animus toward Plaintiff.

119.    Based on Defendant union's breach of DFR of Plaintiff, the Defendant union is liable to Plaintiff for: reinstatement to employment; back pay from the date of termination, back pay for the dates of suspension without pay; prospective pay; damages for unpaid pension, health and welfare benefits; punitive damages for the union's willful and malicious conduct in the breach of their DFR; pre and post judgment interest; and attorney's fees and costs.

## AS AND FOR THE SECOND CAUSE OF ACTION AGAINST VERIZON UNDER A STATE LAW CLAIM OF NEGLIGENT HIRING AND RETENTION OF DEFENDANT PETERS

120.    Plaintiff repeats and re-alleges each and every allegation previously set forth as if fully set forth herein.

121.    A tort claim for negligent hiring and retention is not preempted by sec. 301 of the LMRA 29 USC §185 as it does not pre-empt conduct that is tangentially related to a CBA because it does not require interpretation of the terms of the CBA. Moreover, no CBA exists or covers the employment relationship of Defendant Verizon and Defendant Peters. Peters is a management employee and not a member of the collective bargaining unit under the CBA with Defendant union and Defendant Verizon. This tort claim arises out of the same nucleus of facts as the federal claim and was subject to the Courts supplemental jurisdiction of state law claims.

122.    At all relevant times, as an employer, Defendant Verizon was vicariously liable for the misconduct of its management employee Defendant Peters at the subject workplace.

123.    In a claim for negligent hiring and retention, the Plaintiff must show that there was an employee – employer relationship between the Defendants; that Defendant employer was aware

of defendant employees' pattern of conduct and failed to remediate it; and the employee caused damages to the Plaintiff.

124.    At all relevant times, Defendant Verizon was aware of Defendant Peters' conduct.  Based upon information and belief, on or about 2012 Defendant Verizon employee Adrian Johnson at the Brooklyn office, took legal or administrative action against Defendant Peters' racist harassment of her because Ms. Johnson was of African heritage.  On or about 2015 Defendant Peters caused the termination of supervisor Rahman because he refused to further baselessly suspend Plaintiff at the direction of Defendant Peters.  On or about 2015, a former employee Latisha Pinkney-Warfield wrote a letter to the Defendant union complaining of Defendant Peters who personally travelled to Defendant Verizon's Maryland offices to defame and disparage Ms. Pinkney-Warfield to her new supervisors / management in Maryland.  Ms. Pinkney-Warfield was also of African heritage and stated in the 2015 letter that Defendant Peters was racist and hostile towards people of African heritage and sought to have them fired from the Brooklyn office.  On or about May 2015 Defendant Verizon's EEO office determined that Plaintiff's harassment and retaliatory discharge claims against Defendant Peters was founded and recommended reinstatement to employment.  On or about 2015, Defendant Peters terminated Kendall Moultrie based on a discriminatory FMLA termination list.  Ms. Moultrie, an African American employee also suffered Defendant Peters' comments such as "black people are lazy" and "I love white people."

125.    Based upon information and belief there are numerous other discrimination and harassment claims and legal actions determined or pending against Defendant Peters.

126.     Defendant Verizon did nothing to thwart Defendant Peters' racist, discriminatory and bad faith conduct against Plaintiff and other African American female members of the subject bargaining unit.

127.     Notwithstanding, Defendant Verizon allowed and enabled Defendant Peters to continue with her racist and discriminatory misconduct imposing unjustified suspensions and terminations on Plaintiff and other employees of color who Defendant Peters held an animus towards.  This unfettered misconduct proximately caused economic damage and extreme emotional distress to Plaintiff for which Defendant Verizon is vicariously liable as the employer of Defendant Peters.

128.     Based on Defendant Verizon's negligent and reckless hiring and retention of Defendant Peters, Defendant Verizon is proximately liable to Plaintiff for: back pay from the date of wrongful termination to date, back pay for the unpaid suspensions that were based on Defendant Peters' animus towards Plaintiff, prospective pay, damages for lost pension, health and welfare benefits, and joint and several liability for punitive damages for extreme emotional distress.


### AS AND FOR THE THIRD CAUSE OF ACTION AGAINST DEFENDANT PETERS FOR TORTIOUS INTERFERENCE WITH THE EMPLOYER-EMPLOYEE RELATIONSHIP BETWEEN PLAINTIFF AND DEFENDANT VERIZON.

129.     Plaintiff repeats and re-alleges each and every allegation previously set forth as if fully set forth herein.

130.     This tortious interference by Defendant Peters of the employment relationship between Plaintiff and Defendant Verizon is tangentially related to the CBA as the claim involves conduct outside of the CBA and does not require interpretation of the terms of the CBA.  Therefore, this claim is not pre-empted by 29 USC §185.

131.    An interference with an employment relationship requires a showing that there was an employer – employee relationship, a contract between them, and a third party procured a termination of that contract and caused damage to the employee Plaintiff.

132.    There was a CBA covering the employer – employee relationship between Plaintiff and Defendant Verizon.  Defendant Peters was a third party to the CBA, she was not at any relevant time a member of any collective bargaining unit represented by Defendant union and Defendant Peters was fully familiar with the CBA.  By intentionally and maliciously causing the termination of Plaintiff from her employment based on false pretenses, Defendant Peters proximately caused the termination of the CBA relationship between Plaintiff and Defendant Verizon based on false pretenses and thereby proximately caused damage to Plaintiff.

133.    Based on Defendant Peters' tortious interference with Plaintiff and Defendant Verizon's employment relationship, Defendant Peters is liable to Plaintiff for backpay or loss of wages damages from on or about 2012 to date.   Defendant Peters started imposing her malicious and unjustified suspensions of Plaintiff without pay and wrongful termination in 2015. Defendant Peters caused; damages for Plaintiff's loss of pension, health and welfare benefits as a result of Defendant Peters' wrongful termination and suspension of Plaintiff without pay.

<u>AS AND FOR THE FOURTH CAUSE OF ACTION AGAINST THE UNION AND
VERONICA PETERS FOR INFLICTION OF EXTREME EMOTIONAL DISTRESS</u>

134.    Plaintiff repeats and re-alleges each and every allegation previously set forth as if fully set forth herein.

135.    A New York State law claim for severe emotional distress is actionable against a union for the breach of DFR for outrageous conduct.  *See Baskin v. Hawley* 807 F2d 1120, 1133 (2d Cir. 1986)  Outrageous conduct may be evidenced by malicious and willful conduct by the union.  Id.

136.    Based upon information and belief, during the relevant time period, president of CWA Local 1101 Keith Edwards harbored racial animus toward African American members of the bargaining unit and based upon information and belief there was at least one complaint against the Defendant union and president Keith Edwards for discrimination against bargaining unit members of color or other protected class.  Under Edwards' and Shelton's continuing leadership, this animus was directed toward Plaintiff every time she called the Defendant union to check on the EEO recommendation and when the union refused to grieve Plaintiff's suspension in 2012 when the racist customer verbally attacked and threatened Plaintiff calling her among other vile, racists slurs, the "N" word and Defendant Peters stated that Plaintiff kept this customer on hold too long when she searched for a supervisor to take over the call.  This conduct by the Defendant union and Defendant Peters was malicious and willful and was the proximate cause of harm to Plaintiff.

137.    A similarly situated union would have protected the Plaintiff against a malicious supervisor such as Defendant Peters who relentlessly subjected Plaintiff to suspensions without pay and thereafter wrongful termination from employment based on groundless suspensions.

138.    The defendant union and defendant Peters' fraudulent concealment and bad faith conduct including gaslighting the Plaintiff to believe there was no EEO recommendation to reinstate her employment or that there was no actionable harm for defendant Peters' animus and discrimination against Plaintiff led to depression and anxiety because this job was Plaintiff's main means of support for herself and her son.  Plaintiff suffered immense stress for having endured insufferable, unprovoked, un-invited, un-called for overt racism and discrimination, from Defendant Peters as well as the loss of her livelihood and reputation without any recourse whatsoever.

139.    Defendant union and Defendant Peters' fraudulent concealment and bad faith conduct against Plaintiff, was the proximate cause of Plaintiff's suffering extreme emotional and mental distress and should be awarded additional punitive damages against these Defendants individually and severally in an amount to be determined at the time of trial.

<u>AS AND FOR THE FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS UNDER A NEW YORK STATE LAW CLAIM FOR CIVIL CONSPIRACY</u>

140.    Plaintiff repeats and re-alleges each and every allegation previously set forth as if fully set forth herein.

141.    A New York Claim for civil conspiracy is not an independent tort and therefore, based on a primary tort cause of action.

142.    Based on liability for negligent hiring and retention by Defendant Verizon of Defendant Peters and Defendant Peters who is liable for tortious interference with an employment relationship between Plaintiff and Defendant Verizon; and the Defendant union and Defendant Peters are liable for inflicting extreme emotional distress on Plaintiff  for fraudulent concealment of their bad faith conduct; all named defendants agreed and conspired to intentionally, maliciously and wrongfully terminate Plaintiff from her employment and union benefits based on discriminatory bias and fraudulent concealment of their wrongdoing by jointly and severally denying the existence or receipt of the Verizon EEO  recommendation for Plaintiff's reinstatement for employment with Defendant Verizon EEO and adopted and concealed Defendant Peters' bad faith and discriminatory suspensions and termination of Plaintiff.

143.     Based on the intentional, willful, malicious and discriminatory conduct of Defendants against Plaintiff, Defendants have caused economic and punitive damages for extreme emotional distress to Plaintiff.

144.    Pursuant to their liability for civil conspiracy, Defendant Verizon and Defendant Peters are liable for actual, compensatory, treble and punitive damages and attorneys fees and costs.

Based on the foregoing, Plaintiff respectfully requests that this Court order and enter a judgment in favor of Plaintiff finding and awarding:

1) Defendant union liable for a breach of DFR of Plaintiff; and

2) Defendant Verizon liable for employer liability and negligent hire and retention of Defendant Peters; and

3) Defendant Peters individually liable for tortious interference with the employment relationship of Plaintiff and Defendant Verizon; and

4) Defendant Peters individually and jointly liable with Defendant union for inflicting extreme emotional distress; and

5) Defendant union, Defendant Verizon and Defendant Peters liable for civil conspiracy under New York State law; and

6) Defendant union, Defendant Peters and Defendant Verizon as employer, jointly and severally liable for the infliction of severe emotional distress on Plaintiff; and

7) all named defendants individually, jointly and severally liable for the following damages:

A) Plaintiff's backpay from the date of termination on or about April 1, 2015 to date; and

B) back pay for sixty (60) days unpaid suspension in 2012; and for (30) days in 2014 and for any other suspension imposed by or at the direction of Defendant Peters; and

C) unpaid pension, health and welfare benefits from the date of termination on or about April 1, 2015 to date and for dates of suspension without pay; and

D) actual, consequential and treble damages for civil conspiracy; and

E) actual, compensatory and punitive damages for inflicting extreme emotional

distress; and

F) statutory and/or common law attorney's fees and costs permitted under a breach of

DFR claim and Civil Conspiracy state claim or permitted by other applicable law or

statute; and

8) Ordering Defendant Verizon to immediately re-instate the employment of Plaintiff; and

9) Ordering Defendant union to reinstate Plaintiff's seniority and/or hourly credits under the

CBA and the Pension, health and welfare funds; and

10) for any and further relief that this Court deems just and proper.

Dated: New York, NY
       December 16, 2020

                              Law Office of Susan Ghim

                              _____

                    By:       Susan Ghim
                              244 Fifth Avenue, Suite 1434
                              New York, NY 10001
                              (917) 549-5408
                              Email: SGHIMESQ@GMAIL.COM